UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-22480-ALTMAN/Reid

**HERIBERTO VALIENTE**,

 *Plaintiff*,

*v.*

**NEXGEN GLOBAL, LLC**,

 *Defendant.*

_____/

## ORDER

Our Defendant, Nexgen Global LLC, asks us to send the Plaintiff, Heriberto Valiente, to mandatory arbitration. As Nexgen sees it, Valiente agreed to arbitrate his claims against Nexgen in three ways: (1) when he used Nexgen's website to buy some car-detailing products (this is the "browsewrap theory"); (2) when he clicked a button on the website and consented to receive emails, calls, and text messages from Nexgen (this is the "clickwrap theory"); and (3) when he "double opt[ed]-in" to Nexgen's email, call, and text program by clicking on a link and confirming (in a later email) his email address. Because we find all three of Nexgen's arguments unpersuasive, we **DENY** the Defendant's Motion to Compel Arbitration and to Stay Proceedings ("Motion") [ECF No. 13].

### THE FACTS

"On February 23, 2022, [Valiente] landed on Nexgen's promotional landing page, offer2.getnexgen.com," Motion at 3 (citing Declaration of Michael Cantrell ("Cantrell Decl.") [ECF No. 13-1] ¶ 6), where he purchased "two Nexgen Ceramic Sprays," *ibid*. During the checkout process, Valiente was asked to include his "contact information, including a phone number and an email address." *Id.* at 5 (citing Cantrell Decl. ¶ 10). Before Valiente "could proceed to the next page," where

he would have to provide his billing information, "Nexgen's website guided [him] to click 'Go [T]o

Step #2.'" *Ibid.* "Underneath that button," Nexgen included the following language:

> By clicking "Go To Step #2" above, I consent to receive from Nexgen emails, calls,
> and SMS text messages at any time, which could result in wireless charges, at the
> number provided above. I understand that consent is not a condition of purchase.

*Ibid.* (citing Cantrell Decl. ¶ 10). Valiente ultimately clicked that button and purchased the two Nexgen

products. *Ibid.* ("Plaintiff followed all of these steps before purchasing his two Nexgen products on

the company's website." (citing Cantrell Decl. ¶ 11)).

The bottom of Nexgen's website included a hyperlink to Nexgen's "Terms of Use." *Id.* at 4

("Not only are the Terms of Use accessible at the bottom of the pages that [Valiente] clicked on in

order to redeem the 'Buy One Get One Free' offer, . . . they are prominently accessible on <u>all</u> pages

of Nexgen's website." (emphasis in original)). In support of its Motion, Nexgen gives us the following

two views of this hyperlink from the two pages of its website Valiente visited:



*Id.* at 4–5 (citing Cantrell Decl. ¶ 7).

If Valiente had clicked on the Terms of Use, he would have seen that, "[b]y accessing the Company Website [Nexgen's website], you agree to abide by the Terms of Use and Privacy Policy. If you do not agree to be bound by the terms and conditions of this Agreement, you may not use or access the Service [defined as 'your use of the Company Website and the products and services provided through or in connection with the Company Website']." Exhibit 1 to Cantrell Decl. ("Terms of Use") [ECF No. 13-1] at 10. The Terms of Use also sported a section titled "SMS/MMS MOBILE

MESSAGE MARKETING PROGRAM TERMS AND CONDITIONS" (hereinafter, the "Messaging Program"). *Id.* at 11. Here's what the Messaging Program entailed:

> Nexgen is offering a mobile messaging program (the "Program"), which you agree to use and participate in subject to these Mobile Messaging Terms and Conditions and Privacy Policy . . . . By opting in to or participating in any of our Programs, you accept and agree to these terms and conditions, including, without limitation, your agreement to resolve any disputes with us through binding, individual-only arbitration, as detailed in the "Dispute Resolution" section below. This Agreement is limited to the Program and is not intended to modify other Terms and Conditions or Privacy Policy that may govern the relationship between you and Us in other contexts.

*Id.* at 11–12. The "Dispute Resolution" section required that, "[i]n the event that there is a dispute, claim, or controversy between you and Us . . . such dispute, claim, or controversy will be, to the fullest extent permitted by law, determined by arbitration in Las Vegas[,] Nevada before one arbitrator." *Id.* at 14. The Dispute Resolution Section was followed by additional details about the arbitration provision—for example: "The parties agree to submit the dispute to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA') then in effect." *Ibid.* Together, these two sections are the arbitration agreement Nexgen now wants to enforce.

The Messaging Program also explained that users could either opt in or out of the program as follows:

> 1. User Opt-In: The Program allows Users to receive SMS/MMS mobile messages by affirmatively opting into the Program, such as through online or application-based enrollment forms.

> 2. User Opt-Out: If you do not wish to continue participating in the Program or no longer agree to this Agreement, you agree to reply STOP, END, CANCEL, UNSUBSCRIBE, or QUIT to any mobile message from Us in order to opt-out of the Program. You may receive an additional mobile message confirming your decision to opt-out. You understand and agree that the foregoing options are the only reasonable methods of opting out.

*Id.* at 12.

### THE LAW

In 1925, "Congress enacted the Federal Arbitration Act to overcome 'the judiciary's long-standing refusal' to enforce arbitration agreements and, in particular, to place such agreements 'upon the same footing as other contracts.' The Act thus aimed to 'make arbitration agreements as enforceable as other contracts, but not more so.'" *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1215–16 (11th Cir. 2021) (Newsom, J., concurring) (first quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (cleaned up); and then quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

"Section 2, the primary substantive provision of the Act, provides, in relevant part, as follows: 'A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2 (cleaned up)). The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *Ibid.* (first quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); and then quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms[.]" *Ibid.* (first citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); and then citing *Volt Info. Scis.*, 489 U.S. at 468).

The Eleventh Circuit has "recognized that the FAA creates a 'presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014)). So, "parties may agree to arbitrate

gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (citing *Rent-A-Ctr.*, 561 U.S. at 68–69). At the same time, "'while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.'" *Bazemore*, 827 F.3d at 1329 (quoting *Dasher*, 745 F.3d at 1116).

As an early aside, this is precisely why we reject Nexgen's argument that "any question of whether the arbitration provision is valid and applicable here is for an arbitrator, and not the Court, to decide." Motion at 14. In saying so, Nexgen cites *Rent-A-Center* for the proposition that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Motion at 14 (citing *Rent-A-Ctr.*, 561 U.S. at 68–69). But Nexgen ignores the very important "caveat" the Supreme Court made sure to include in this discussion: "There is one caveat," the Court said, which is that "*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), held that '[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so.'" *Rent-A-Ctr.*, 561 U.S. at 69 n.1; *see also id.* at 70 ("An agreement to arbitrate a gateway issue is simply an *additional*, *antecedent* agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this *additional* arbitration agreement just as it does on any other." (emphases added)). Nexgen doesn't identify any "clear and unmistakable evidence" that Valiente agreed to arbitrate the threshold question of whether he assented to arbitration of any (future) claims against Nexgen. Instead, Nexgen says, Valiente "*agreed* that any arbitration shall be initiated through the American Arbitration Associate (the 'AAA')," Motion at 14 (emphasis added), and it notes that, "under well settled-case law, arbitration provisions that appoint the AAA as the arbitrator delegate the issue of arbitrability to the arbitrator," *ibid.* (citing *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d

1327, 1332 (11th Cir. 2005) ("By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid.")).

But, in advancing this theory of delegation-by-incorporation, Nexgen completely ignores the threshold problem, which is that the parties must agree to an arbitration agreement *before* we can find that any single section of that arbitration agreement—*e.g.*, the governing arbitration body—has been assented to. Nexgen's reliance on *Terminix* is thus misplaced. In that case, the plaintiff "did not deny that all of its contracts with Terminix included broadly worded arbitration clauses[.]" *Terminix*, 432 F.3d at 1329. Indeed, "[t]he parties signed twenty separate contracts, each of which contained an arbitration clause." *Id.* at 1329 n.1. Given the number and extent of the parties' unambiguous agreements, therefore, the plaintiff in *Terminix* never tried to disavow its assent to those arbitration agreements. Instead, the plaintiff's argument in *Terminix* was that application of the arbitration agreement in the circumstances presented there violated the "*Colorado River* abstention doctrine." *Id.* at 1329.

Our case, by contrast, squarely presents the question the parties in *Terminix* had conceded—*viz.*, whether Valiente agreed to arbitrate his claims in the first place. If he didn't, then *Terminix*'s holding—that, by incorporating Rule 8 of the AAA's Rules, the parties had necessarily agreed to allow the AAA to assess the viability of the arbitration agreement—is neither here nor there. Which brings us all the way back to the beginning: Nexgen must present "clea[r] and unmistakabl[e]' evidence" that "the parties agreed to arbitrate arbitrability[.]" *Rent-A-Ctr.*, 561 U.S. at 69 n.1 (cleaned up). Since (as we'll soon see) Nexgen has failed to offer us any such evidence, we can't (and won't) infer that the Plaintiff agreed to incorporate the AAA's rules, to arbitrate the question of arbitrability, or (it goes without saying) to arbitrate the merits of his future claims. *See, e.g., AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986) ("The first principle . . . is that arbitration is a matter of

contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. . . . This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." (cleaned up)); *see also id.* at 649 ("The second rule, which follows inexorably from the first, is that the question of arbitrability . . . is undeniably an issue for judicial determination. *Unless* the parties *clearly* and *unmistakably* provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (emphases added)).

In either event, as with any other contract, "a party will not be required to arbitrate where it has not agreed to do so." *Valiente v. StockX, Inc.*, 2022 WL 17551090, at *2 (S.D. Fla. Dec. 9, 2022) (Bloom, J.) (citing *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010), *aff'd*, 433 F. App'x 842 (11th Cir. 2011)). "It is axiomatic that the determination of whether the parties have agreed to submit a dispute to arbitration is an issue of law subject to judicial resolution." *Ibid.* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("It is well settled in both commercial and labor cases that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." (cleaned up))); *see also Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011) ("As the [FAA] makes clear, arbitration is a creature of contract. *Parties must agree to arbitrate in the first instance*, and may contractually limit or alter the issues to be presented to the arbitrators, the scope of the award, and, as here, the form of the award." (emphasis added)). And, in deciding whether the parties agreed to arbitrate their claims, the Eleventh Circuit has adopted the view of "sister circuits that a summary judgment-like standard is appropriate and [held] that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333 (quoting FED. R. CIV. P. 56(a)); *see also Totten v. Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016) ("'When evaluating

a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party.'" (quoting *Chavez v. Bank of Am.*, 2011 WL 4712204, at *3 (N.D. Cal. Oct. 7, 2011) (applying California law))).

## ANALYSIS

The parties spend a great deal of time disagreeing about conflict-of-laws issues. But, as we'll soon see, we don't need to decide which law applies here because Nexgen loses under either California or Florida law. Valiente charges Nexgen with "assum[ing] that Florida law applies to this Court's analysis regarding whether a contract was formed between the parties." Plaintiff's Response in Opposition to the Defendant's Motion to Compel Arbitration ("Response") [ECF No. 15] at 5. In Valiente's view, the "Defendant's Terms of Use . . . provide that California law governs irrespective of any choice of law principles." *Ibid.* (citing Terms of Use at 19). Valiente acknowledges that, "'[u]nder Florida's choice-of-law rules, *lex loci contractus* applies in contract matters[.]'" *ibid.* (quoting *Allen v. Hartford Fire Ins. Co.*, 2017 WL 3682346, at *3 (M.D. Fla. Aug. 25, 2017) (Dalton, J.)). Still, he maintains that we should enforce the choice-of-law provision in the Terms of Use "'unless the law of the chosen forum contravenes strong public policy.'" *Ibid.* (quoting *Allen*, 2017 WL 3682346, at *3); *see also ibid.* ("Accordingly, this Court should apply California law to the issue of contract formation.").

Valiente's position is somewhat circular. As one of our colleagues has noted, "[b]ased on Plaintiff's challenge to the very existence of an agreement, applying Utah law would be improper because 'applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.'" *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021) (Bloom, J.) (quoting *Herman v. Seaworld Parks & Ent., Inc.*, 2016 WL 7447555, at *3 n.2 (M.D. Fla. Aug. 26, 2016) (Scriven, J.)); *see also StockX*, 2022 WL 17551090, at *3 ("Because there is a threshold issue of whether Plaintiff assented to the Terms,

which includes the choice of law clause therein, Florida's law of contract formation applies to first determine the existence of a contract." (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.")))

As we've said, however, we don't need to resolve this conflict-of-laws issue because Nexgen loses under *both* California *and* Florida law. *Cf. In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 5112142, at *4 (11th Cir. Aug. 10, 2023) ("And under Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a 'false conflict,' such that the different laws point to the same outcome under the facts of the case."); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("But whether the choice of law provision applies depends on whether the parties agreed to be bound by Barnes & Noble's Terms of Use in the first place. As the district court acknowledged in its order, we need not engage in this circular inquiry because both California and New York law dictate the same outcome.").

With this background in mind, we turn to the merits of Nexgen's Motion. Nexgen (recall) says that Valiente agreed to arbitrate his claims in three ways: *first*, by using Nexgen's website (the "browsewrap" theory), *see* Motion at 11; *second*, by clicking a button on the website and consenting to receive emails, calls, and text messages from Nexgen (the "clickwrap" theory), *id.* at 10; and *third*, by "double opt[ing]-in" to Nexgen's marketing program, *id.* at 12. Using both Florida and California law, we'll address—and reject—each argument in turn.

## I.   Nexgen's Browsewrap Theory

"With respect to online or electronic contracts, such as the one here, there are at least two types of agreements: browsewrap and clickwrap. A browsewrap agreement occurs when a website provides a link to the terms and conditions and does not require the user to click an acknowledgement

during the checkout process. The user may complete the transaction without visiting the page containing the terms and conditions." *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022) (applying Florida law); *see also Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020) ("When determining whether there is a binding agreement with respect to a website's terms of use, courts often analyze Internet contracts in two groups: 'clickwrap' agreements, in which website users are required to click on an 'I agree' box after being presented with a list of the terms and conditions of use, and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen" (applying California law)).

Under Florida law, "a browsewrap agreement . . . is enforceable when the purchaser has *actual knowledge* of the terms and conditions, *or* when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on *inquiry notice*." *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1189–90 (S.D. Fla. 2021) (Bloom, J.), *aff'd*, 2022 WL 1499693 (11th Cir. May 12, 2022) (cleaned up & emphases added). Similarly, under California law, "the 'validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.'" *Lee*, 817 F. App'x at 394 (quoting *Nguyen*, 763 F.3d at 1176). As we'll see, Nexgen's Motion fails under either state's test.

In Nexgen's view, "because [Valiente] could complete his transaction without visiting the page containing Nexgen's Terms of Use, Nexgen's website contained an offer for a browsewrap agreement." Motion at 11. In saying so, Nexgen wisely doesn't suggest that Valiente had *actual* knowledge of its Terms of Use. Instead, Nexgen contends that its website "provides a reasonably prudent person *inquiry notice* of Nexgen's Text Terms and its arbitration/class action waiver provision." *Id.* at 12 (emphasis added). *Two* problems with this.

*One*, courts applying Florida *and* California law have "[u]niformly . . . declined to enforce 'browsewrap' agreements when the hyperlink to the terms and conditions is buried at the bottom of

the page, and the website never directs the user to review them." *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. 4th DCA 2017) (applying Florida law and citing *Nguyen*, 763 F.3d at 1777 (collecting cases)); *see also Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) (applying California law and finding that "the Terms & Conditions hyperlink is more or less buried at the bottom of the Defendant's webpage. Under *Nguyen*, without more, this is insufficient to give rise to inquiry notice."). And Nexgen's Terms of Use *were* buried in a hyperlink at the bottom of its website. *See* Motion at 4 ("Not only are the Terms of Use accessible *at the bottom* of the pages that [Valiente] clicked on in order to redeem the 'Buy One Get One Free' offer, they are prominently accessible on <u>all</u> pages of Nexgen's website. Indeed, [Valiente] would have accessed four short pages with the Terms of Use hyperlink *at the bottom* before completing his order[.]" (citing Cantrell Decl. ¶ 7) (emphases added)). Indeed, the screenshots Nexgen includes in its Motion—which a consumer would only see after scrolling beyond the various sections of product-related text at the top and middle of the page— further support our view that Nexgen buried its Terms of Use in a hyperlink at the bottom of its website. Take a look:



*Ibid.* As this image shows, the Terms of Use can be found tucked neatly away in an unassuming hyperlink set out in relatively small font at the very bottom of the page (just above the inconspicuous—and rarely, if ever, seen—copyright notice). Just for good measure, here's another screenshot—this time, from the checkout page:



Response at 3.[1] Again, the Terms of Use are buried in a hyperlink—which itself appears in small font—at the very bottom of the page.

---

[1] The parties dispute the authenticity of each other's screenshots only *once*—on the exact language Nexgen included underneath the green "Go To Step #2" button at the checkout page. In Nexgen's

*Two*, under both Florida and California law, "'[w]hether a reasonably prudent user is put on inquiry notice turns on the *clarity* and *conspicuousness* of [the] terms.'" *Fridman*, 554 F. Supp. 3d at 1260 (quoting *Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1230 (S.D. Fla. 2020) (Moreno, J.) (emphases added)); *see also Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) ("This court looks to 'the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design' in determining 'whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.'" (quoting *Nguyen*, 763 F.3d at 1177)). "In the context of web-based contracts, clarity and conspicuousness are a function of the design and content of the relevant interface." *Fridman*, 554 F. Supp. 3d at 1260. "[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. . . . Because 'online providers have complete control over the design of their websites,' 'the onus must be on website owners to put users on notice of the terms which they wish to bind customers[.]'" *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022) (first quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16 (2021); and then quoting *Nguyen*, 763 F.3d at 1179). And, as we're about to explain, Nexgen's website *didn't* conspicuously display its Terms of Use in a way that would have put a reasonably prudent consumer (like Valiente) on notice that, by simply visiting the website, he was waiving all rights to litigate his future claims in court.

---

version, the warning under the "Go To Step #2" button reads: "By clicking 'Go To Step #2' above, I consent to receive from Nexgen emails, calls, and SMS text messages any time, which could result in wireless charges, at the number provided above. I understand that consent is not a condition of purchase." Motion at 6. Valiente's version, by contrast, reads: "By clicking 'Go To Step #2' above, I consent to receive from Nexgen emails. I understand that consent is not a condition of purchase." Response at 4. For two reasons, this discrepancy doesn't matter at all. *One*, we're using Nexgen's version anyway, so we're accepting (for today's purposes) its premise that Valiente has omitted some text from the warning. *Two*, whether Valiente agreed to receive just emails or emails, texts, and calls has nothing to do with the issue we've been asked to decide today—which is whether Valiente consented to *arbitration*.

As a preliminary matter, we agree with Nexgen that we cannot look to "any one factor in a vacuum" and that, instead, we should "analyze[ ] whether the defendant provided inquiry notice . . . holistically[.]" Motion at 11. When we do that, however, Nexgen's browsewrap theory fails. Nexgen believes that its "placement of its Messaging Program terms directly beneath the 'Go To Step #2' button in conjunction with Nexgen's Terms of Use hyperlink being accessible on every page of Nexgen's website, and in close proximity to the Buy One Get One Free button <u>and the</u> 'Got [sic] To Step #2' button on the offer2.getnexgen.com pages provides a reasonably prudent person inquiry notice of Nexgen's Text Terms[.]" *Id.* at 12 (emphasis in original). But the images Nexgen attaches to its Motion belie this contention.

As we've suggested, Nexgen's website design does a pretty good job of burying the Terms-of-Use hyperlink. Or, as the Ninth Circuit explained in a similar case, Nexgen's "textual notice" of the Terms of Use is "deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Berman*, 20 F.4th at 857. To understand why we think so, let's look at the screenshots the parties submitted of the two pages Valiente visited on Nexgen's site. The first is the home page a user finds himself in when he visits Nexgen's website ("offer2.getnexgen.com"). This is a long page, densely populated with images and lots of text (most of which comes in several different bright colors, alternating fonts, and various sizes). As a user makes his way down the page, he's presented with four different call-to-action buttons: "Get This Deal," "Try Nexgen Today," "Try Nexgen 100% Risk Free," and, at the very end, "Buy One Get One FREE! Offer Expires Soon." Here's what that page looks like:



Response at 2. Valiente would thus only have seen the Terms of Use—which are in smaller and non-descript white font—if he had passed each of these much larger, more conspicuous buttons and (finally) made it to the very bottom of an otherwise-busy page. Conspicuous means "obvious to the eye or mind," "easily noticed," or "plainly visible." *Conspicuous*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/conspicuous   (last

visited Sept. 22, 2023). Nexgen's display of its Terms of Use on its home page is pretty much the *opposite* of conspicuous.

Nexgen's reliance on the second page—the one that displays the "Go To Step #2" button— fares no better. True, the invitation to receive emails, calls, and texts *is* "directly beneath," Motion at 12, the "Go To Step #2" button. But the invitation to receive emails, calls, and texts is totally irrelevant to the issue we're adjudicating today. What matters for today's purposes is the conspicuousness of the *Terms-of-Use* hyperlink because *that's* where Nexgen's arbitration clause can be found. And *that* hyperlink—which (again) is at the very bottom of this page—is *nowhere near* the "Go To Step #2" button. Indeed, according to the image we have in the record, our user would have to scroll past three rows of customer reviews *and* a "Finish Checkout" button—which (notably) flashes an arrow redirecting the user to *scroll back up*—before he even gets a chance to see the Terms-of-Use link at all. Here's what we mean:



Response at 3. And, just in case our readers missed the incongruency between the vibrancy of the "Finish Checkout" button and the inconspicuousness of the Terms-of-Use link, here's a closeup of that part of the website:





Motion at 5. We think it goes without saying that this "Finish Checkout" button and its accompanying arrow—all encased in a bright-orange button and in much larger font—"draw the user's attention away from the" terms of Use. *Berman*, 30 F.4th at 857. Even if that weren't true, though, Nexgen "has provided no evidence to rebut [the] Plaintiff's assertion that a user can avail himself of the Website's services . . . *without ever* having to scroll to the bottom of the Website's pages that feature the hyperlink to the Terms." *Fridman*, 554 F. Supp. 3d at 1263 (emphasis added); *see also* Response at 4 ("But any reasonabl[e] consumer would have had no occasion or reason to scroll to the bottom of the website because, as depicted above, both pages contain large green call-to-action buttons *at the top of the pages* directing the consumer how to complete their purchase." (emphasis in original)).[2]

Against all this, Nexgen advances two arguments—both unavailing. *First*, Nexgen says that "the hyperlink to the Terms of Use was presented in a manner that makes clear [it is] clickable, [it is] set apart from surrounding text, [and it is] set forth in a contrasting color and visible on all pages of the website." Motion at 12 (citing *Berman*, 30 F.4th at 857). As we've explained, we disagree with this—principally because the Terms of Use were presented in small, colorless text and buried inconspicuously at the very bottom of a long and busy page (which itself was full of bright words, colorful action buttons, and vivid images). We add here only that Nexgen's reliance on *Berman* is totally misplaced. The defendants in *Berman* had argued—as Nexgen does here—that, by simply visiting their websites, the plaintiffs had agreed to arbitrate any claims they might later have against the defendants. *See Berman*, 30 F.4th at 853 ("[The] defendants moved to compel arbitration, arguing that plaintiffs'

---

[2] In California, Nexgen's browsewrap theory would fail for yet another reason—because, even if the Terms-of-Use link were conspicuous (it isn't)—and even if that link did appear beside the relevant button (it doesn't)—the website never prompted Valiente to take any action (one way or the other) with respect to the Terms of Use. *See, e.g.*, *Nguyen*, 763 F.3d at 1178–79 ("[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.").

use of the websites signified their agreement to the mandatory arbitration provision found in the hyperlinked terms and conditions."). The "district court rejected this argument," *ibid.*, and "concluded that the content and design of the webpages did not conspicuously indicate to users that . . . they were agreeing to [the defendants'] terms and conditions," *id.* at 855. The defendants appealed, and the Ninth Circuit—applying both New York and California law—affirmed. In doing so, the court framed the issue this way: "Under what circumstances," the court asked, "can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?" *Id.* at 853. Unlike the website we have here (more on this in a minute), the websites in *Berman* all included a notice, "in fine print," that read as follows: "I understand and agree to the Terms & Conditions which includes mandatory arbitration." *Ibid.* (cleaned up). The court "rejected" the defendants' contention that this disclaimer was sufficient to create an arbitration agreement because the "[p]laintiffs did not unambiguously manifest their assent to the terms and conditions when navigating through the websites, and as a result they never entered into a binding agreement to arbitrate their dispute." *Ibid.* The court then explained—in words that apply with equal force here—*why* it was rejecting the defendants' browsewrap theory:

> While it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists. . . . Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. *Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks.* The failure to clearly denote the hyperlinks here fails our conspicuousness test.

*Id.* at 857 (cleaned up & emphasis added).

Our case is even more straightforward. Unlike the websites in *Berman*, after all, the words "arbitrate" or "arbitration" never appear on the two pages Valiente visited. Instead, Valiente would have had to (first) find the Terms of Use, then intuit that the Terms of Use included some information

that mattered to him, and finally click on the Terms of Use and read them carefully before he would ever have been presented with an arbitration clause like the one the Ninth Circuit found *insufficient* in *Berman*. That (salient) difference aside, *Berman* is on all-fours with our case. Nexgen presents its Terms of Use in the same font, the same flavorless color (white), the same typecase (notably *without* "all capital letters"), and the very same (tiny) size as all the surrounding text[3]—which includes the "Privacy Policy," the "Return Policy," the "VIP Policy," the "Shipping Policy," "Contact Us," and "Order Tracking," all of which (we presume) are identically hyperlinked.[4] Just beneath this series of monochromatic texts, the website gives us (again, in the same color typecase, font, and size), Nexgen's copyright warning ("© Nexgen Global LLC | 2665 N Atlantic Ave Suite 315 Daytona Beach, Fl 32118 | All Rights Reserved"), which we would imagine few, if any, users have ever carefully perused and which (again) is presented in the same format as the inconspicuous text above it.

As this recitation should make plain, *none* of the text in this carefully interred section of the website is underscored, *none* of it appears in all-capital letters, and *none* of it is displayed in contrasting fonts or colors in a way that would distinguish it from any non-hyperlinked material. There is, in other words, no meaningful way for users to discern what's a hyperlink and what's not without "hover[ing]

---

[3] Nexgen wants us to ignore all this because (as it rightly notes) "the hyperlink to the Terms of Use was presented in a . . . contrasting color," Motion at 12—by which it means that the white Terms-of-Use link was set against the website's black background. Two problems with this. *One*, all text (whether on the Internet or on paper) is necessarily of a different color than the background behind it. Otherwise, it would be unreadable. Obviously, then, the fact that the Terms-of-Use link was white and the background was black cannot, standing alone, render the Terms-of-Use link conspicuous. If it did, *every* text would be conspicuous and all arbitration agreements—however inconspicuous in practice—would be enforceable. *Two*, and for that same reason, the law rightly doesn't ask whether a website's text and background are of different colors. Instead, to put a consumer on inquiry notice, the law asks *only* whether the webpage's text was contrasted from *the surrounding text. See, e.g.*, *Sellers*, 289 Cal. Rptr. 3d 1, 28 (finding notice insufficient because it was not "in contrasting type, font, or color to the *surrounding text* of the same size" (emphasis added)).

[4] We can't say for sure that any of this text is hyperlinked because—and this is yet another big problem for Nexgen—these words and phrases don't, on their own, give off any indication of being hyperlinked. They aren't, for instance, blue or underlined or highlighted in a way we have typically come to expect from hyperlinked text.

their mouse over otherwise plain-looking text or aimlessly click[ing] on words on a page in an effort to ferret out hyperlinks." *Ibid.* (cleaned up). As in *Berman*, then, Nexgen's failure to "clearly denote the hyperlinks here fails [the] conspicuousness test." *Ibid.*

*Second*, Nexgen insists that, "[a]t a bare minimum, seeing the verbiage immediately under the 'Go To Step #2' button . . . serves as inquiry notice to seek out Nexgen's terms and conditions and instructions on how to retract consent that was provided by clicking the button." Motion at 12. That's frivolous. The "Go To Step #2" button says absolutely nothing about a Terms-of-Use policy. Instead, it alerts users that, "[b]y clicking 'Go To Step #2' above, I consent to receive from Nexgen emails, calls, and SMS text messages at any time, which could result in wireless charges, at the number provided above." Motion at 6. "I understand," it goes on, "that consent is not a condition of purchase[.]" *Ibid.* Only a lawyer who litigates arbitration motions would think that an alert about future emails, calls, and texts *might* put average consumers on notice that they should scroll to the very bottom of a long and busy webpage where, if they investigate the small sets of inconspicuous text long enough, they might find the Terms of Use—and that, contrary to what one might naturally assume, those Terms of Use govern, *not* our enterprising consumers' use of the products they're buying, but their right to access the court system in the future.

Whether under Florida or California law, in sum, Nexgen's website didn't put Valiente on actual or inquiry notice of its Terms of Use and didn't alert him "of the legal significance of the action [ ]he must take to enter into a contractual agreement." *Berman*, 30 F.4th at 858; *see also Fridman*, 554 F. Supp. 3d at 1264 (applying Florida law and finding that "the record does not support the conclusion that [the] Plaintiff was on constructive notice of the Website's Terms, which include the arbitration and class action waiver provisions," because, "contrary to [the] Defendant's assertions, the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the pages where it is featured"). We therefore reject Nexgen's browsewrap contentions.

## II.      Nexgen's Clickwrap Theory

Nor are we persuaded by Nexgen's "clickwrap" theory. Nexgen argues that, when Valiente "input[ ] his contact information, click[ed] on 'Go To Step #2,' and purchas[ed] his Nexgen products, [he] agreed to be bound by Nexgen's Text Terms/Terms of use." Motion at 10. Again, we disagree.

Unlike a browsewrap agreement, "a clickwrap agreement occurs when a website directs a purchaser or user to the terms and conditions of the sale and requires the user to click a box to acknowledge that they have read those terms and conditions." *Massage Envy*, 339 So. 3d at 48 (applying Florida and Arizona law); *see also Disney Enters., Inc. v. Redbox Automated Retail, LLC*, 336 F. Supp. 3d 1146, 1152 (C.D. Cal. 2018) ("A 'clickwrap' agreement, in contrast, requires users to affirmatively manifest assent to terms on a website or software installation screen by, after being presented with the terms, clicking on some version of an 'I agree' button." (applying California law)).

If these kinds of agreements sound familiar, that's because they are: "Today, virtually every Internet user is familiar with what have become known as clickwrap agreements—'agreements [formed by] requiring a computer user to 'consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] . . . transaction.'" *Bazemore*, 827 F.3d at 1327 (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012)). "Courts have also largely approved the use of clickwrap agreements for the same basic reason that they have approved the use of shrink wrap agreements: the consumer is on notice that an agreement exists and receives the opportunity to review the terms of that agreement and to consent. But of course, courts' acceptance of these types of agreements contemplates that the promoters of the clickwrap agreement can demonstrate that the alleged acceptor, in fact, either digitally or by paper, received a copy of the agreement at issue." *Mason v. Midland Funding LLC*, 815 F. App'x 320, 322 (11th Cir. 2020).

As we've suggested, Nexgen has offered us no evidence for its position that, before he could buy Nexgen's products, Valiente was "direct[ed] . . . to the terms and conditions of the sale" or was

required "to click a box to acknowledge that [he] ha[d] read those terms and conditions." *Massage Envy*, 339 So. 3d at 484. Here's the button Nexgen is referring to when it says that Valiente "click[ed] on 'Go To Step #2'" and thereby "agreed to be bound by Nexgen's Text Terms/Terms of Use," Motion at 10:



*Id.* at 6 (citing Cantrell Decl. ¶ 10). Again, the language of this notification is clear and unambiguous: "By clicking 'Go To Step #2 above,'" Valiente "consent[ed] to receive from Nexgen emails, calls, and SMS text messages at any time, which could result in wireless charges, at the number provided above." *Ibid.* Valiente also understood and agreed "that consent is not a condition of purchase." *Ibid.*

But nowhere did Nexgen warn Valiente that, by clicking that button, he was "consent[ing] to Nexgen's *Messaging Program*, which is governed by Nexgen's Text Terms and Terms of Use," *ibid.* (emphasis added), and which incorporates the all-important arbitration agreement. Nexgen defines its "Messaging Program" to mean "Nexgen's SMS/MMS Mobile Message Marketing Program." *Id.* at 2. And the "SMS/MMS Mobile Message Marketing Program" *does* appear in Nexgen's Terms of Use. *See* Terms of Use at 11. But—and this is the crucial point Nexgen appears to be missing here—Nexgen's Marketing Program *isn't* mentioned in the warning Valiente assented to (the one about receiving emails, calls, and texts). Nor (as we've said) did that warning direct Valiente to the Terms of Use or ask him to represent that he'd read those terms—all of which the law wisely requires before it will hold a consumer to a clickwrap agreement. *See, e.g., Massage Envy*, 339 So. 3d at 484 ("[A] clickwrap agreement occurs when a website *directs* a purchaser or user *to the terms and conditions* of the sale and

requires the user to click a box to acknowledge *that they have read those terms and conditions*." (emphases added); *see also Arencibia*, 533 F. Supp. 3d at 1190 n.3 ("Florida courts have recognized two main types of internet contracts: (1) clickwrap agreements: when a website *directs* a purchaser to the terms and conditions of the sale *and requires* the purchaser to click a box to acknowledge that they have read those terms and conditions. . . ." (cleaned up & emphases added)); *Regan v. Pinger, Inc.*, 2021 WL 706465, at *6 (N.D. Cal. Feb. 23, 2021) ("However, the Sideline [terms of service] are also not a pure-form clickwrap agreement. In a pure-form clickwrap agreement, users typically click an 'I agree' box after being presented with a list of terms and conditions of use. A user of the Sideline App, by contrast, *was not forced to actually read* the [terms of service] before assenting to them. Moreover, a Sideline user *did not click a button labeled 'I agree'* when they assented to the [terms of service]. Instead, a user clicked buttons for actions like "Create Account," "For Personal Use," or "Login," and those buttons did not explicitly reference the [terms of service]." (cleaned up & emphases added)).

Our case is thus very different from *StockX*, where Judge Bloom (of our Court) rightly agreed with the defendant's clickwrap theory because the consent-prompt at issue there "*required* [the] Plaintiff to click a box acknowledging that he read the *terms and conditions* prior to creating his account, constituting a clickwrap agreement." 2022 WL 17551090, at *4 (emphases added). Here's what the prompt in that case looked like:



*Ibid.* As this image makes clear, the defendant in that case displayed the "Terms of Service" link *between* the two most important parts of the website—the main login box and the "Submit" button—and then distinguished it from the site's other text by presenting it in bright (read: conspicuous) blue colors. None of that is true here. But the StockX website also did much more than that: As we can see above, it required the plaintiff, as a condition of moving forward, to "*agree* to the Terms of Service[.]" *Ibid.* (emphasis added). Our website, by contrast, *never* required Valiente to agree to the Terms of Use— which (we reiterate) *weren't* displayed in bright blue text in the center of the page (or frankly anywhere near any button that would be relevant to a user whose only goal was to find, and pay for, his products). *StockX* thus cannot guide us here.

Our case, in short, is much more like *Berman*, where the Ninth Circuit had this to say about the defendants' websites:

> In using the websites, Hernandez and Russell did not take any action that unambiguously manifested their assent to be bound by the terms and conditions. Defendants rely on plaintiffs' act of clicking on the large green 'continue' buttons as manifestation of their assent, but *merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything.* A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly

advised that the act of clicking will constitute assent to the terms and conditions of an agreement.

30 F.4th at 857–58 (cleaned up & emphasis added).

Still resisting, Nexgen contends that Valiente "cannot argue that he did not read Nexgen's Text Terms because, under Florida law, 'a plaintiff is bound by all of the terms of a contract, including an arbitration clause, regardless of whether he actually read them or understood them at the time he assented.'" Motion at 10 n.4 (quoting *Greenberg v. Drs. Assocs., Inc.*, 338 F. Supp. 3d 1280, 1282 (S.D. Fla. 2018) (Ungaro, J.)). And that's true. *See StockX*, 2022 WL 17551090, at *4 ("That [the] Plaintiff may not have actually read the Terms before *affirmatively assenting* to them is not dispositive." (emphasis added)). But that only matters when a party *actually assents* to the offer. *See, e.g., Guadagno v. E\*Trade Bank*, 592 F. Supp. 2d 1263, 1271 (C.D. Cal. 2008) ("[A] party may be bound by a 'clickwrap' agreement if the terms are clear *and acceptance is unambiguous*, regardless of whether he actually reads them." (emphasis added)); *see also Greenberg*, 338 F. Supp. 3d at 1282 ("Under Florida law, a plaintiff is bound by all of the terms of a contract, including an arbitration clause, regardless of whether he actually read them or understood them *at the time he assented*." (emphasis added)). Since we find that Valiente did *not* assent to the arbitration agreement in this case, Nexgen's he-needn't-have-read-it argument is neither here nor there.

Because Valiente was never directed to the Terms of Use—and since he was never asked to represent that he read the Terms of Use—we reject Nexgen's clickwrap theory.

## III.    Nexgen's "Double Opt-in" Argument

In its third (and final) argument for arbitration, Nexgen claims that, after he purchased his Nexgen products, Valiente "took the additional affirmative step to agree to receive Nexgen's marketing messages when he double opted-in to Nexgen's Messages Program, which means he confirmed the email address he put into Nexgen's website by clicking a link that Nexgen sent to his email address to confirm his identity." Motion at 7 (citing Cantrell Decl. ¶ 12); *see also id.* at 12 ("What

is more, Valiente was placed on further inquiry notice after receiving an email prompting him to confirm his agreement to receive Nexgen's marketing messages when he double opted-in to Nexgen's Messages Program."). But the only evidence Nexgen provides for this proposition is Cantrell's declaration—which we've just quoted above—and an exhibit Cantrell attaches to this declaration, which appears to be a screenshot of a Nexgen computer program that includes only four pieces of information: (1) Valiente's name; (2) his phone number; (3) his email address; and (4) the words "DOUBLE OPT-IN." *See* Exhibit 2 to Cantrell Decl. ("Double Opt-In Screenshot") [ECF No. 13-1] at 21.

Try as we might, we have no idea what this screenshot means—principally because Nexgen elected *not* to attach the email Valiente received or the page to which that email directed him. We thus cannot say whether that email or page referenced Nexgen's Terms of Use (or its Messaging Program) *at all* and, if they did, *how* that Terms-of-Use link was displayed. (Was it, for instance, buried at the bottom of a long page in colorless, inconspicuous text?) Nor does anyone (much less Nexgen) tell us whether, through that email, Valiente was asked to assent to Nexgen's Terms of Use. And Cantrell's declaration doesn't suggest that it did. Instead, Cantrell alleges *only* that, based on his review of the Double Opt-In Screenshot, Valiente "confirmed the email address he put into Nexgen's website by clicking a link that Nexgen sent to his email address to confirm his identity." Cantrell Decl. ¶ 12. But that's irrelevant. We don't care whether Valiente confirmed his identity by clicking on a link and then *either* entering his email address *or* clicking a box to affirm that Nexgen had correctly displayed it. The question here is whether, before he took these steps, Nexgen's email to him (or the page to which that email directed him) *either* (1) conspicuously referred him to the arbitration agreement (or to the Terms of Use incorporating that agreement) *or* (2) required him to confirm that he had read the Terms of Use. Without Nexgen's email—or any indication of what that email (or the redirect page) looked

like—Nexgen has failed to show that Valiente opted in (double or otherwise) to its arbitration agreement.

And (lest we forget) it was indisputably Nexgen's burden to show that Valiente agreed to its terms. *See, e.g.*, *Bazemore*, 827 F.3d at 1333 ("We agree with our sister circuits that a summary judgment-like standard is appropriate and hold that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." (quoting FED. R. CIV. P. 56(a))); *see also Totten*, 152 F. Supp. 3d at 1249 ("'When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party.'" (quoting *Chavez*, 2011 WL 4712204, at *3)). Since Nexgen has, despite this burden, produced no *relevant evidence* in support of this part of its claim, we reject its "double opt-in" contentions. *See Breaux v. NCL (Bahamas) Ltd.*, 2022 WL 2304254, at *8 (S.D. Fla. June 24, 2022) (Altman, J.) ("*No* evidence . . . isn't enough to withstand summary judgment."); *see also Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1220 n.6 (S.D. Fla. Mar. 22, 2022) (Altman, J.) ("[S]peculation isn't enough to survive summary judgment.").

***

After careful review, therefore, we hereby **ORDER AND ADJUDGE** as follows:

1. Nexgen's Motion to Compel Arbitration and to Stay Proceedings [ECF No. 13] is **DENIED**.

2. Nexgen must respond to the Complaint [ECF No. 1] by October 6, 2023.

**DONE AND ORDERED** in the Southern District of Florida on September 22, 2023.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record