# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 11, 2025

FILED BY _____ JG _____ D.C.

Dec 11, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  23-13308-HH
Case Style: Heriberto Valiente v. NexGen Global, LLC
District Court Docket No: 1:22-cv-22480-RKA

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

Clerk's Office Phone Numbers
General Information:   404-335-6100      Attorney Admissions:       404-335-6122
Case Administration:  404-335-6135      Capital Cases:             404-335-6200
CM/ECF Help Desk:     404-335-6125      Cases Set for Oral Argument: 404-335-6141

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

### For the Eleventh Circuit

———————————

No. 23-13308

———————————

HERIBERTO VALIENTE,

*Plaintiff-Appellee,*

*versus*

NEXGEN GLOBAL, LLC,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-22480-RKA

———————————

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued
on this date in this appeal is entered as the judgment of this Court.

Entered: November 10, 2025

For the Court: DAVID J. SMITH, Clerk of Court

**NOT FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13308

Non-Argument Calendar

_____

HERIBERTO VALIENTE,

*Plaintiff-Appellee,*

*versus*

NEXGEN GLOBAL, LLC,

*Defendant-Appellant.*

_____

Appeal from the United States District Court

for the Southern District of Florida

D.C. Docket No. 1:22-cv-22480-RKA

_____

Before LUCK, ABUDU, and WILSON, Circuit Judges.

PER CURIAM:

Nexgen Global, LLC, ("Nexgen"), appeals an order of the district court denying its motion to compel arbitration in this suit alleging violations of the Telephone Consumer Protection Act

2                    Opinion of the Court                    23-13308

("TCPA"), 47 U.S.C. § 227, *et seq*., and the Florida Telephone Solicitation Act, ("FTSA").[1]  On appeal, Nexgen argues the district court erred in denying its motion because the motion established that a valid arbitration agreement existed and covered the claims in this case, meaning the district court should have compelled Valiente to arbitrate.  After careful review, we affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Heriberto Valiente sued Nexgen in August 2022, alleging that it had violated the TCPA and the FTSA by sending out unsolicited telemarketing messages, including to numbers like Valiente's, which were on the National Do-Not-Call Registry, and by doing so without prior express consent.

Nexgen moved to compel arbitration under Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4.  Factually, it explained that, on February 23, 2022, Valiente had accessed Nexgen's website and purchased two products.  In doing so, he had clicked on a promotional banner that was located on the website above a "Terms of Use" hyperlink.  Then, Valiente clicked through pages of the Nexgen website before arriving at the checkout page.  At the checkout page, Valiente was met with a "Go To Step #2" button that, according to Nexgen, if clicked, represented consent to Nexgen's "Messaging Program."  Nexgen attached the following picture of the "Go To Step #2" button to its motion:

---

[1] *Valiente v. Nexgen Glob., LLC*, No. 22-cv-22480, 2023 WL 6213583 (S.D. Fla. Sept. 25, 2023).

Case 1:22-cv-22480-RKA   Document 36   Entered on FLSD Docket 12/11/2025   Page 5 of 27
USCA11 Case: 23-13308   Document: 26-1   Date Filed: 11/10/2025   Page: 3 of 23

23-13308          Opinion of the Court          3



The "Messaging Program," Nexgen argued, was "governed by" the "Terms of Use," which, in turn, included an arbitration provision. Valiente clicked the "Go To Step #2" button and purchased two products. Valiente also entered his contact information. At this point, Valiente was then emailed to confirm his identity by verifying his email address. Nexgen asserted Valiente had so confirmed.

Nexgen argued that, legally, these facts meant that Valiente agreed to arbitrate, for three reasons. To understand these arguments, we provide a brief explanation of several contract terms referenced throughout. We analyze these terms more below.

First, Nexgen argued that its website created an enforceable browsewrap agreement (*i.e.,* its "browsewrap theory"). As a general matter, a browsewrap agreement is one where "a website . . . provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process." *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (quoting *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017)). Nexgen argued that such an agreement was formed here because the nature and format of its website was conspicuous enough to lead a reasonable

consumer to the "Terms of Use" hyperlink, which gave Valiente inquiry notice[2] regarding the contents of those terms.  It asserted the "Terms of Use" hyperlink was accessible on each page of its website and that the Messaging Program, which were "governed by" the "Terms of Use," were directly beneath the "Go To Step #2" button.  Nexgen also asserted the nature of its website conspicuously directed consumers to the "Terms of Use" because the hyperlink was clickable, set apart from the surrounding text, in a contrasting color, and visible on all pages of the website.

Nexgen also argued that Valiente entered into a clickwrap agreement (*i.e.,* Nexgen's "clickwrap theory") by clicking the "Go To Step #2" button to consent to the "Messaging Program."  In general, a clickwrap agreement—sometimes called a "point and click agreement"—is an agreement "in which a computer user agrees to the terms of an electronically displayed agreement by pointing the cursor to a particular location on the screen and then clicking."  *Point-and-Click Agreement*, BLACK'S LAW DICTIONARY (12th ed. 2025) ("Also termed . . . clickwrap agreement . . . .").  Nexgen alleged that Valiente's consent to the "Messaging Program" served as consent to the "Terms of Use" because the "Messaging Program" was "governed by" the "Terms of Use," which is where the arbitration agreement was located.

---

[2] In this context, inquiry notice refers to "[n]otice attributed to a person when the information would lead an ordinary prudent person to investigate the matter further."  *Inquiry Notice*, BLACK'S LAW DICTIONARY (12th ed. 2025).

Finally, Nexgen asserted that Valiente double-opted into the arbitration agreement when he received an email prompting him to confirm his identity and agreement to receive Nexgen's marketing messages (*i.e.,* Nexgen's "double opt-in theory").  Nexgen argued that this confirmation served as consent to the "Terms of Use" because it also enrolled him in the "Messaging Program" which was "governed by" the "Terms of Use."  Nexgen also contended that Valiente's claims in this suit fell within the scope of the parties' agreement.  Nexgen attached a declaration from a founder and member of Nexgen to support its factual explanation of Valiente's conduct and the website's layout.

Valiente opposed Nexgen's motion.  He claimed that Nexgen had cropped and enlarged portions of its website in its motion and that Nexgen's motion did not depict how he encountered the "Terms of Use" hyperlink when he was shopping on Nexgen's website.  Additionally, he asserted Nexgen's website failed to advise consumers that they were assenting to Nexgen's "Terms of Use" by purchasing products or by simply using the website.  He also contended each of Nexgen's theories failed to show that he had agreed to the arbitration provision.

First, he claimed the browsewrap on the website was insufficient to establish an enforceable agreement because the website was not conspicuous enough for a reasonable person to be put on inquiry notice of the "Terms of Use" link.  Specifically, he contended that the placement of the "Terms of Use" link—at the bottom of the website, in white coloring and in a smaller font size—

made the link insufficiently conspicuous, especially because Nexgen's website was cluttered with other material—including much larger and green font messages—that distracted from the hyperlink. He argued no reasonable customer would have scrolled to the bottom of the website and looked at the link or would have known to do so.

Next, Valiente contended that there was no clickwrap agreement because nothing on the website alerted a consumer that clicking on any button manifested their assent to the "Terms of Use." Furthermore, he argued he was not adequately notified that terms and conditions were in place nor of the fact that by clicking the "Go To Step #2" button, he was agreeing to be bound by the "Terms of Use."

Lastly, Valiente argued that he did not consent to the arbitration provision because the website failed to specifically incorporate and describe the arbitration provision. Valiente explained that the website at times referred to "Terms of Use" but was silent about the arbitration provision Nexgen was seeking to enforce. Moreover, Nexgen's failure to specifically describe and incorporate the arbitration provision meant, in Valiente's view, that he was never placed on notice of the arbitration provision and therefore did not consent.

The district court denied the motion to compel arbitration in a lengthy and thorough written opinion. *Valiente*, 2023 WL 6213583, at *1, *14. It explained that Nexgen's three theories did

not establish that Valiente had agreed to arbitrate his claims with Nexgen.

First, the court rejected Nexgen's "browsewrap theory." The court looked to the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of these "Terms of Use," and the website's general design, in determining whether a reasonably prudent user would have inquiry notice of the browsewrap agreement.  It explained that Nexgen's website was a very long page densely populated with images and lots of texts coming in bright colors, alternating fonts, and various sizes. The "textual notice" of the "Terms of Use" was de-emphasized, the court explained, by the overall design of the webpage and other visual elements draw the user's attention away from the text.  Further, Nexgen's "Terms of Use" were buried inconspicuously in a hyperlink at the very bottom of a busy website which appears in a small, white font that no reasonably prudent person would be alerted to click on because an average consumer would not have had any reason to scroll to the bottom of the website.  Accordingly, it concluded Nexgen's website did not put Valiente on actual or inquiry notice of its "Terms of Use" and the hyperlink was not prominent or conspicuous.

Next, the district court rejected Nexgen's "clickwrap theory."  The court considered whether both parties affirmatively manifested assent to the terms on the website.  It concluded that, by clicking "Go To Step #2 above," Valiente consented to receive emails, calls, and SMS text messages at any time from Nexgen, but

nowhere did Nexgen warn Valiente that, by clicking that button, he was consenting to the "Messaging Program," which is "governed by" the "Terms of Use" and incorporates the arbitration agreement. As the court explained, Valiente was never directed to the "Terms of Use" and was never asked to represent that he had read the "Terms of Use" or agreed to them.

Finally, the district court rejected Nexgen's "double opt-in" theory. While Nexgen claimed that, after Valiente purchased his Nexgen products, Valiente took an additional affirmative step by agreeing to receive Nexgen's marketing messages by double opting-in to Nexgen's Messaging Program and confirming his email address, the court noted that Nexgen did not attach the email or page referenced. The court concluded that, without Nexgen's email, or any indication of what the email or redirect page looked like, it was unable to conclude that the email referred Valiente to the arbitration provision or required him to confirm that he had read the "Terms of Use." For these reasons, the court denied Nexgen's motion for arbitration. This interlocutory appeal followed.[3] The district court stayed proceedings during the pendency of the appeal. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 738 (2023).

## II. STANDARD OF REVIEW

"We review *de novo* the denial of a motion to compel arbitration but review for clear error any factual findings involved."

---

[3] We have jurisdiction over Nexgen's interlocutory appeal. *Bess v. Check Express*, 294 F.3d 1298, 1302 (11th Cir. 2002); 9 U.S.C. § 16(a).

*Merritt Island Woodwerx, LLC v. Space Coast Credit Union*, 137 F.4th 1268, 1272 (11th Cir. 2025); *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1316 & n.18 (11th Cir. 2002), *abrogated in part on other grounds by Morgan v. Sundance, Inc.,* 596 U.S. 411, 419 (2022). "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation" that we also review *de novo. Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001).

### III. DISCUSSION

We first analyze which state's law applies to this dispute. Second, we assess the merits of the district court's ruling that Nexgen had not established that Valiente had agreed to an arbitration agreement.

### A. The District Court Correctly Ruled on the Choice of Law Question.

Nexgen contends that both Florida and California law govern whether Valiente agreed to enter an arbitration agreement, and that both states' law show that the arbitration agreement was enforceable. Valiente agrees that both states' laws produce the same outcome as, under either, he did not enter into an arbitration agreement.

"[U]nder Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a 'false conflict,' such that the different laws point to the same outcome under the facts of the case." *Juncadella v. Robinhood Fin. LLC (In re January 2021 Short Squeeze Trading Litig.)*, 76 F.4th 1335, 1346 (11th Cir. 2023) (quoting *Tune v. Phillip Morris Inc.*, 766 So. 2d 350, 352–53 (Fla. 2d DCA

2000)).[4] Here, "[l]ike the district court, we think that California and Florida law point to the same outcome." *Id.*; *Valiente*, 2023 WL 6213583, at ⋆4–5. Therefore, we reference caselaw from both states throughout our discussion to show we would reach the same conclusion under either states' law.

### B.  The District Court did not Err in Concluding that no Arbitration Agreement Existed between the Parties.

Arbitration is strictly a matter of consent and, thus, while it is a way to resolve disputes, it is only used to resolve disputes that the parties have agreed to submit to arbitration. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Parties cannot be forced to submit to arbitration if they have not agreed to arbitrate. *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 853–54 (11th Cir. 1992), *overruled in part on other grounds by First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Once a party moves to compel

---

[4] In assessing which state's law applies to the choice-of-law question, the parties and the district court relied on cases where a federal court was sitting in diversity jurisdiction, and where applying state choice-of-law rules would be required by Supreme Court precedent. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."). Yet, Valiente has brought at least one claim under federal law, and the district court was not sitting in diversity. Nonetheless, because the underlying question of contract formation is still one of state law, we similarly apply *Klaxon*'s choice-of-law approach here. *See Fagin v. Gilmartin*, 432 F.3d 276, 281–82 (3d Cir. 2005) (applying *Klaxon* to a federal question jurisdiction case); *cf. Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020) ("[O]nly limited areas exist in which federal judges may appropriately craft the rule of decision.").

arbitration, 9 U.S.C. § 4 provides the governing procedure." *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1347 (11th Cir. 2025). If the existence of the agreement is not generally disputed, a court must compel arbitration. *Id.* However, if the opposing party raises a genuine dispute of material fact, the court may hold a summary trial. *Id.*[5]

In many ways, the FAA's framework "mirrors summary judgment." *Id.* In the summary judgment framework, a moving party has the initial "burden of demonstrating that there are no genuine issues of material fact." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024). On issues where the moving party bears the burden, it "must show that, on all the essential elements of its case on which it bears the burden of proof . . . , no reasonable jury could find for the nonmoving party." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1320 (11th Cir. 2024) (quoting *United*

---

[5] Nexgen does not contend there are factual disputes here and has not requested a summary trial—which the FAA contemplates may be necessary in some instances. *See Lamonaco*, 141 F.4th at 1347. Accordingly, we do not consider whether that route would have been appropriate. *See, e.g., Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27–28 (2d Cir. 2002) (Sotomayor, J.) (declining to remand case for a trial under Section 4 of the FAA because party seeking a trial on appeal had not requested the district court hold one); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("If we were to regularly address questions—particularly fact-bound issues—that district courts never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.").

*States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*)).

Whether an arbitration agreement exists and constitutes an enforceable contract is a matter of state contract law.  *Lamonaco*, 141 F.4th at 1347; *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1327, 1330 (11th Cir. 2016).  Under both California and Florida state law, the burden of proving that an enforceable arbitration agreement exists falls on the party seeking to arbitrate.  *See Palm Garden of Healthcare Holdings, LLC v. Haydu*, 209 So. 3d 636, 638 (Fla. Dist. Ct. App. 2017); *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So. 2d 658, 661 (Fla. Dist. Ct. App. 2008); *Serafin v. Balco Props. Ltd., LLC*, 185 Cal. Rptr. 3d 151, 156 (Cal. Ct. App. 2015); *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 13 (Cal. Ct. App. 2021).  "[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore*, 827 F.3d at 1329 (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014)).

With these preliminaries set out, our focus is on whether Nexgen established that the parties entered into an arbitration agreement.[6]  In the following sections, we explain why the district court was correct: Nexgen did not show: (1) that its website created an enforceable browsewrap agreement; (2) that its website created

---

[6] For clarity, we note the "Terms of Use" on Nexgen's website were the only place where the arbitration terms were, so if Valiente did not enter an agreement containing the "Terms of Use," Nexgen cannot prevail.

an enforceable clickwrap agreement; or (3) that Valiente double-opted into an arbitration agreement.

### i.      *Browsewrap Theory*

Nexgen's arguments on appeal echo its arguments before the district court. It first contends that Valiente had "inquiry notice" of its Messaging Program terms, creating an enforceable browsewrap agreement.[7] We disagree.

Florida law explains that a "browsewrap" agreement occurs when a website provides a link to the terms and conditions and does not require the user to click an acknowledgment during the checkout process. *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022). Florida "law imposes a heightened burden on a party seeking to enforce agreements that are more akin to browsewrap than clickwrap." *Mia. Dolphins*, 410 So. 3d at 689. "Such agreements are enforceable only where 'the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.'" *Id.* (quoting

---

[7] Nexgen's arguments also seem to conflate browsewrap and clickwrap agreements to some degree, even though they are different types of agreements under both Florida and California law. *See Mia. Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689 (Fla. 3d DCA 2025); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014) (applying California law). We distinguish these two types of agreements and assess whether Nexgen has established that either type exists here. We will address clickwrap agreements in further detail as well.

14                      Opinion of the Court                    23-13308

*MetroPCS Commc'ns*, 273 So. 3d at 1028).[8]   These barriers help
"avoid[] the unfairness associated with enforcing contractual terms
that consumers never intended to accept." *Id.*   Accordingly, courts
have "[u]niformly . . . declined to enforce 'browsewrap' agree-
ments when the hyperlink to the terms and conditions is buried at
the bottom of the page, and the website never directs the user to
review them." *Vitacost.com*, 210 So. 3d at 765.

California law on browsewrap agreements is quite similar.
To form a contract under California law, the parties must manifest
their mutual assent to the terms of the agreement. *Specht*, 306 F.3d
at 29.   An enforceable browsewrap agreement is created when a
website offers terms that are disclosed through a hyperlink and the
user manifests assent to those terms by continuing to use the web-
site. *See Nguyen*, 763 F.3d at 1176; *Berman v. Freedom Fin. Network,
LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (same); *see also Long v. Provide
Com., Inc.*, 200 Cal. Rptr. 3d 117, 126 (Cal. Ct. App. 2016) ("[T]o
establish the enforceability of a browsewrap agreement, a textual
notice should be required to advise consumers that continued use
of a Web site will constitute the consumer's agreement to be
bound by the Web site's terms of use."); *see also Weeks v. Interactive
Life Forms, LLC*, 319 Cal. Rptr. 3d 666, 673 (Cal. Ct. App. 2024) ("We
decline to depart from *Long* and *Nguyen*.").   California courts are

---

[8] The district court concluded Valiente did not have "actual knowledge" and
Nexgen has not challenged that ruling on appeal.   Therefore, our focus in this
section, for Florida law at least, is on whether "the hyperlink to the terms and
conditions [wa]s conspicuous enough to put a reasonably prudent person on
inquiry notice." *Mia. Dolphins*, 410 So. 3d at 689.

reluctant to enforce browsewrap agreements because consumers are frequently unaware that contractual terms are being offered by a website, much less that continued use of the website will constitute acceptance of those terms. *See Long*, 200 Cal. Rptr. 3d at 126; *Nguyen*, 763 F.3d at 1178.  At bottom, California federal and state courts have "reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding . . . clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable." *Sellers*, 289 Cal. Rptr. 3d at 12.

Because the touchstone of contract formation is mutual assent, California courts have expressed that "merely" placing a hyperlink on a website poses a "problem" for an online merchant because website visitors might not understand that the hyperlink "contains binding contractual terms." *Long*, 200 Cal. Rptr. 3d at 126–27.  This is true even when the hyperlink is "conspicuous" because prudent internet users might not know to click the hyperlink and review the terms. *Id*. at 127.  Yet, at a bare minimum, a terms of use hyperlink must be "conspicuous." *Id*. at 126 (rejecting hyperlink as insufficiently conspicuous because it "[wa]s located on a submerged page, requiring the customer to scroll below layers of order summary details, advertisement banners, hyperlinks . . . , several logos . . . , and customer service contact information" and the terms were "printed in grey typeface on a white background"). California courts have explained that this approach comports with California "law's long-standing skepticism of charging parties with

knowledge they do not actually possess." *Weeks*, 319 Cal. Rptr. 3d at 675.

Here, the district court correctly held that, under both California and Florida law, Nexgen has not shown an enforceable browsewrap agreement. As the court explained, Nexgen's website did not make its "Terms of Use" conspicuous such that it would put a reasonable person on inquiry notice of them. *See MetroPCS Commc'ns, Inc.*, 273 So. 3d at 1028; *Berman* 30 F.4th at 856; *Long*, 200 Cal. Rptr. 3d at 126. Nor does the website suggest that mere use of the website necessarily reflects assent to the "Terms of Use." *Nguyen*, 763 F.3d at 1176; *Berman*, 30 F.4th at 856.

The placement of the "Terms of Use" hyperlink was far from obvious or noticeable. The hyperlink was located at the bottom of the page of a website that was crowded with various other information. In addition, the hyperlink was not in a contrasting color, *see Sellers*, 289 Cal. Rptr. 3d at 11–12; *Long*, 200 Cal. Rptr. 3d at 126, it was in white coloring and a small font and did not have the hallmarks of a hyperlink—*i.e.*, if a consumer did not happen to hover their cursor over it, they might not know it is a link because the text was not "blue or underlined or highlighted in a way [one might] expect from hyperlinked text." *Valiente*, 2023 WL 6213583, at *9 n.4. In all, the "Terms of Use" hyperlink was easy to miss due to the distracting website and large green call-to-action buttons that were nowhere near the terms. *See Specht*, 306 F.3d at 35. On these facts, a reasonable person would not think to scroll down all the way to the bottom of a busy page, with large, green, call-to-

action buttons, and notice a hyperlink that is in a small, white font. Moreover, nothing on Nexgen's website explained that "continued use of [its] Web site . . . constitute[d] . . . agreement to be bound by the Web site's terms of use." *Long*, 200 Cal. Rptr. 3d at 126; *see also MetroPCS Commc'ns*, 273 So. 3d at 1028.

In addition, as Nexgen concedes, "Florida and California courts have declined to enforce browsewrap agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them." Our reading of Florida and California law is consistent with Nexgen's and forecloses this theory—Nexgen's website did not direct users to the "Terms of Use" Nexgen now argues are binding. The district court, thus, correctly denied the motion to compel arbitration on the theory that there was an enforceable browsewrap agreement under Florida or California law.

### ii.    *Clickwrap Theory*

Nexgen's clickwrap theory equally is unsuccessful, primarily because of its own choices.[9]  A clickwrap agreement is created when users assent to terms by clicking a button near a disclosure referencing those terms. *Lamonaco*, 141 F.4th at 1347; *see Bazemore*,

---

[9] Nexgen asserts that the district court erred in analyzing its "clickwrap theory" as a standalone theory, as it was presented in aid of a browsewrap theory. The problem with Nexgen's position is that, to prevail, Nexgen must establish that an enforceable arbitration agreement exists, *Haydu*, 209 So. 3d at 638; *Serafin*, 185 Cal. Rptr. 3d at 156, and whether we consider these two theories of contract separately or together, we reach the same conclusion.

18                    Opinion of the Court                    23-13308

827 F.3d at 1333.  Whether a clickwrap agreement forms a valid contract also depends on state contract law.  *Bazemore*, 827 F.3d at 1347; *First Options of Chi.*, 515 U.S. at 944.  The central question is whether the parties mutually assented to be bound.  *Bazemore*, 827 F.3d at 1347; *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675,680–81 (11th Cir. 2018).  In the clickwrap context, that inquiry turns on whether the relevant terms were reasonably presented and whether the user took clear, affirmative steps to accept them. *MetroPCS Commc'ns*, 273 So. 3d at 1028.

Under Florida law, a clickwrap agreement is "generally enforceable."  *Massage Envy*, 339 So. 3d at 484.  However, relevant here, the "clickwrap agreement occurs when a website directs a purchaser or user to the terms and conditions of the sale and re-quires the user to click a box to acknowledge that they have read those terms and conditions.  *Id.* (emphasis in original).

Under California law, similarly, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable clickwrap agreement can be formed.  *Berman*, 30 F.4th at 856.  For example, a clickwrap agreement may be formed when website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use.  *Nguyen*, 767 F.3d at 1175.  In a clickwrap agreement, the consumer has received notice of the terms being offered.  *Berman*, 30 F.4th at 856.  Courts have routinely found clickwrap agreements enforceable, especially as compared to browsewrap agreements.  *Id.*

Here, under California or Florida law, Nexgen has not shown an enforceable clickwrap agreement that contains an arbitration agreement. *See Bazemore*, 827 F.3d at 1347; *Berman*, 30 F.4th at 856. Nothing on the website informed users that clicking on any button manifested their assent to the "Terms of Use" or the "Messaging Program." Nexgen's "Go To Step #2" button makes this clear:



This language makes clear that Valiente agreed to *certain* things by clicking "Go To Step #2"; but it was not terms that might be found in a different "Terms of Use" section of the website, it was "consent to receive from Nexgen emails, calls, and SMS text messages at any time, which could result in wireless charges, at the number provided above." The language says nothing about arbitration, nor about any other conditions outside the express terms. *See MetroPCS Commc'ns,* 273 So. 3d at 1028. By including an explicit consent to receive "emails, calls, and SMS text messages" without mentioning arbitration, in fact, the "Go To Step #2" button suggests the opposite of Nexgen's argument—*i.e.*, that a website user was not consenting to arbitration by clicking "Go To Step #2." *Cf. S. Coast Corp. v. Sinclair Refin. Co.*, 181 F.2d 960, 961 (5th Cir. 1950)

20                    Opinion of the Court                    23-13308

("The expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed.").[10]  Therefore, even if we assume the "Go To Step #2" button created a clickwrap agreement, Valiente would still prevail because that agreement does not contain an arbitration provision.

Indeed, Nexgen's reading of the Go To Step #2 button suggests this language put a reasonable person on notice of "the Messaging Program" (not mentioned) which then were "governed by" the "Terms of Use" (also not mentioned), when the much more logical reading is that the agreement is exactly what it says—that he "consent[ed] to receive from Nexgen emails, calls, and SMS text messages at any time."  That is different from consenting to the "Messaging Program" or the "Terms of Use."   In this respect, Nexgen's unsuccessful clickwrap theory collapses back into its unsuccessful browsewrap theory.   Under a clickwrap theory, however, Valiente did not have to root around Nexgen's website to find additional terms to which he would be bound.  *Massage Envy*, 339 So. 3d at 484; *Nguyen*, 767 F.3d at 1175; *Berman*, 30 F.4th at 856. Nowhere on the website does Nexgen warn Valiente that by clicking the "Go To Step #2" button, he was consenting to the "Messaging Program" which is "governed by" the "Terms of Use."  A consumer in Valiente's position would not have known to review

_____

[10] All Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding precedent in this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

the "Terms of Use"; he was never directed to them and was never asked to represent that he had read them.  *MetroPCS Commc'ns,* 273 So. 3d at 1028; *Nguyen*, 767 F.3d at 1175.

On these facts, accordingly, we cannot say the district court erred in concluding that Nexgen failed to show an enforceable clickwrap agreement.

### iii.    *Double Opt-In Theory*

As noted above, Nexgen bore the burden to prove that there was an enforceable arbitration agreement.  Applying the analogous summary judgment standard, *Lamonaco*, 141 F.4th at 1347, this means that Nexgen, the moving party, bore "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact" on this issue, *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  As to its "double opt-in theory," Nexgen failed to meet this burden.

Nextgen's "double opt-in" argument is based on the notion that, after Valiente purchased products from Nexgen, Valiente "provided a second express consent" to the "Messaging Program" by confirming his identity in response to an email from Nexgen.  First, as we already explained, Nexgen did not prove that Valiente agreed to the "Messaging Program"—at most he agreed to the

statement provided under the "Go To Step #2" button.[11]  Second, Nexgen failed to attach any documents showing what Valiente "opted-in" to over email (*i.e.*, the 'second time') or what that process entailed.  Without evidence of Nexgen's purported email, or any indication of what the email or redirect page stated, Nexgen never established the existence of this second email "double opt-in" method that would have directed Valiente to the arbitration agreement, or that the email required that he agree to arbitration.  Therefore, Nexgen has failed to establish the existence of an arbitration agreement through this alternate theory of contract creation.  *Iyere v. Wise Auto Grp.*, 303 Cal. Rptr. 3d 835, 842 (Cal. Ct. App. 2023) (explaining that an "arbitration proponent must first recite verbatim, or provide a copy of," an alleged arbitration agreement); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) ("To prove the existence of a contract [under Florida law], a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) *sufficient specification of the essential terms*." (emphasis added)); *see also Com. Factors Corp. v. Kurtzman Bros.*, 280 P.2d 146, 147–48 (Cal. Ct. App. 1955); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 101 Cal. Rptr. 347, 351 (Cal. Ct. App. 1972).  For those reasons, we conclude the district court did not err in rejecting this argument as a basis for requiring arbitration.

---

[11] As explained, Nexgen is incorrect that its reference to text messages in the "Go To Step #2" button referred Valiente to the "Terms of Use," so Nexgen's focus on the "Messaging Program" in this theory is unavailing as well.

### IV. CONCLUSION

Because the district court did not commit any reversible error, we affirm the lower court's decision.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 10, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-13308-HH
Case Style:  Heriberto Valiente v. NexGen Global, LLC
District Court Docket No:  1:22-cv-22480-RKA

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing <u>must</u> include a Certificate of Interested Persons**. <u>See</u> 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion